UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-------------------------------------------------------X
CHRISTINA WEAVER, ADMINISTRATRIX
OF THE ESTATE OF JOSEPH J. O'DONNELL
& CHRISTINA WEAVER, INDIVIDUALLY,

                        Plaintiffs,

v.                                                           MARCH 7, 2022

UNITED STATES OF AMERICA,

                        Defendant.
-------------------------------------------------------X
```

## AMENDED COMPLAINT

Plaintiffs, CHRISTINA WEAVER, ADMINISTRATRIX OF THE ESTATE OF JOSEPH J. O'DONNELL and CHRISTINA WEAVER in her individual capacity, by and through their undersigned counsel, for their Amended Complaint, filed as of right pursuant to Fed. R. Civ. P. 15(a), allege as follows:

**Parties**

1. Plaintiff CHRISTINA WEAVER is the administratrix of the Estate of Joseph J. O'Donnell, the estate of her late husband. She was appointed administratrix by the Danbury Probate Court by order dated December 17, 2020.

2. Plaintiff CHRISTINA WEAVER is a resident of Danbury, Connecticut.

3. This is an action arising from torts committed by agents of the United States of America's Veterans Health Administration and Department of Veterans Affairs. Defendant UNITED STATES OF AMERICA is a party defendant pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq.

**Jurisdiction and Venue**

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 due to the federal question raised by the Federal Tort Claims Act.

5. Venue is properly lodged in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2).

6. The jurisdiction of this court is exclusive pursuant to 28 U.S.C. § 1346(b)(1).

7. The Plaintiffs served notice of their claims upon the Department of Veterans Affairs on August 13, 2021.

8. The Department of Veterans Affairs acknowledged receipt on August 16, 2021 by letter dated October 5, 2021.

9. More than six months have elapsed since the claims were filed.

10. The claims have not been resolved and pursuant to 28 U.S.C. § 2675(a) the Plaintiffs may proceed with this action on the grounds that the claim has been denied.

**Facts**

*The VA Hospital Campus*

11. The Veterans Health Administration operates a hospital campus in West Haven, Conn. (the "VA hospital campus"). The VA hospital campus was first opened as a tuberculosis center in 1918. It served as an Army hospital after World War I. The campus closed in the 1940s and was reopened in the 1950s as a VA hospital.

12. The infrastructure of the VA hospital campus shows its age. Connecticut's senior Senator, Richard Blumenthal, has for years sought additional funding to upgrade the campus.

13. The VA hospital campus has been repeatedly cited by the United States Occupational Safety and Health Administration for safety violations.

14. The VA hospital campus contains a main hospital building and several dozen additional buildings that support the work of the agency.

15. The VA hospital campus is powered in part by steam. The steam is generated on campus in a central boiler plant. Pressurized steam is piped throughout the VA hospital campus from the boiler plant.

16. Building 22 of the VA hospital campus is adjacent to the boiler plant. It is primarily a maintenance garage.

17. In the past, Building 22 housed laundry facilities.

18. As of November 2020, Building 22 had several garage bays, areas for storage, maintenance workspaces, one or more offices, and a break room.

19. Steam pipes run through Building 22.

20. Beneath the Building 22 break room is a small windowless concrete utility room, which measures approximately eight feet by twelve feet. The only means of access to this room is via an external concrete staircase alongside the building.

21. As of November 13, 2020, the external concrete staircase descended to an in-swinging steel door.

22. The utility room contains a collection of pipes and valves. Steam is fed from the boiler plant into the utility room via a six-inch diameter pipe. From there, the system has a variety of components that direct steam, change its pressure, and control condensate.

23. As the steam line enters the utility room, it elbows down and over horizontally into a tee fitting. At the bottom of the tee is a six-inch diameter drip leg, which is approximately twelve (12) inches long with a threaded flange and a blank bolted to the flange. A steam trap was tapped off approximately 3-4 inches from the bottom of the drip leg flange.

24. The configuration described in paragraph 23 does not meet current VA design requirements. To wit:

   a. Any pipe over two (2) inches is required to be a welded connection, not a threaded connection. The drip leg was threaded.

   b. The drip leg should have contained a blowdown valve at the bottom of it. It did not.

   c. The steam trap condensate return line should have been at least six (6) inches from the valve. It was not.

   d. The isolation valves were butterfly valves, which are not allowed per VA specification.

   e. Two valve isolation for high pressure steam lines in the boiler plant were not present. There was no means to isolate any of the three main steam lines leaving the boiler plant short of securing the entire boiler plant.

25. Upon information and belief, some of the components of the system in the utility room date to 1949 while other components date to the 1980s or later.

*Joseph J. O'Donnell*

26. Joseph J. O'Donnell was an employee of Mulvaney Mechanical, Inc. on November 13, 2020.

27. He was known by his colleagues and employees of the VA hospital campus as "Joey O."

28. Joey was a licensed Heating, Piping & Cooling Unlimited Journeyperson and was so licensed by the State of Connecticut since 2011.

29. Joey was 36 years old on November 13, 2020.

30. Joey was married to Chistina Weaver on February 15, 2020.  Weaver was pregnant with their first child on November 13, 2020.  Their child, J.O., was born in 2021.

*Safety Concerns in Building 22*

31. Concerns about the steam system in Building 22 were well known to VA hospital campus employees who frequented the building:

    a. Employees who worked in Building 22 were familiar with the frequent sound of clanging pipes that were clear signs of water hammers.

    b. When it was unlocked in the morning, it was common for the breakroom to be filled with steam. Employees would often wait a few moments for the steam to clear before entering.

    c. The steam condition in the breakroom was so severe that paint peeled from the lockers.

32. No written procedures relating to lock outs/tag outs of the steam system existed in November 2020 and employees were not trained in procedures relating to lock out/tag out or the proper shutdown or restart of the steam system in Building 22. The VA hospital campus did not maintain a lock out/tag out log for Building 22 or, upon information and belief, any building.

33. The steam system in Building 22 was not maintained according to industry or federal government standards.

34. Records of steam system maintenance were not adequately maintained.

35. Steam traps in Building 22 were not routinely cleaned.

36. The steam system in Building 22 was not subject to the jurisdiction of the Connecticut State Boiler Inspector and was not regularly inspected.

37. The VA had previously been cited by OSHA for failing to adequately inspect and maintain the system in Building 22 prior to November 13, 2020.

38. Despite prior citation, no efforts were made to bring the design of the steam system in Building 22 into compliance with modern design standards.

39. In early November 2020, George Mulvaney, the owner of Mulvaney Mechanical, Inc., was in the utility room in Building 22. He was quoting a project to handle a variety of repairs across the VA hospital campus. When in the utility room, he photographed the pipes in

operation and took video demonstrating a spurting y-strainer. He commented to VA employee Euel Sims that he was "afraid" to touch anything in the room.

40. Euel Sims was a longtime VA plumber. He was licensed as a Plumbing & Piping Unlimited Journeyperson.

41. Euel and his colleague, Roger Jansen, had a documented history of whistleblowing. They raised more than one safety complaint regarding work conditions at the VA hospital campus.

42. Jansen was demoted from his role as HVAC supervisor in or about October 2020. He has held a Heating, Piping & Cooling Limited Journeyperson license since 1995.

43. Jansen was demoted following his whistleblowing activity.

44. Jansen was replaced as HVAC supervisor by Tom Andrews. Andrews was previously in the grounds department.

45. In Andrews' own words, he planned to "pick up the technical" of HVAC, including the safe handling of high-pressure steam, on the job.

46. Andrews holds no professional or trade licenses with the State of Connecticut.

47. Andrews had no prior experience working with pressurized steam and was unqualified to manage an industrial HVAC system.

*The Leaky Pipe*

48. In one of the rear areas of Building 22, known as Room 104A, a steam pipe runs near the ceiling. It makes a ninety-degree turn as it passes through the room. The joints are secured by bolts with a flange between the pipes to control leaks.

49. The flange in one particular joint deteriorated over time and, as a result, steam and condensate were observed leaking from the pipe in early Fall 2020.

50. On November 4, 2020, a request was made to repair the leak.

51. On November 6, 2020, a request was made to shut down steam in Building 22 for asbestos abatement.

52. The plumbing department shut off steam to Building 22 on or about November 6, 2020. Steam was not shut off from the boiler plant. It was only shut off from within the utility room in Building 22. Live steam continued to enter the utility room but was held there by a closed valve.

53. The boiler plant is overseen by David Kripps. Once steam leaves the boiler plant, the system is the responsibility of the plumbing department and Andrews. Kripps does not hold any State of Connecticut professional or trade licenses.

54. On November 9, 2020, the asbestos abatement project was completed. The steam remained off in Building 22.

55. On November 11, 2020, Jansen was scheduled to handle the repair with a representative from Mulvaney Mechanical.

56. Jansen objected to handling the task on account of his concerns regarding safety. He believed that the steam should be shut down from the boiler plant prior to undertaking the repair and recharging the steam lines in Building 22.

57. Jansen suggested November 15, 2020 would be an appropriate date for the repair because the plant was scheduled to be taken offline on that date for maintenance.

58. The job was nevertheless rescheduled for November 13, 2020 over Jansen's objection.

59. Jansen was not scheduled to work on November 13, 2020.

60. Mulvaney Mechanical was retained to handle the job on a "time and materials" basis. Mulvaney dispatched Joey O. for the job.

61. Joey was not advised of the safety concerns in Building 22.

62. Neither Kripps nor anyone in the boiler plant were advised of the work or the plan to recharge the steam lines in Building 22.

*Disaster in Building 22*

63. Joey arrived at Building 22 at about 7:00am on November 13, 2020. It was a gray November day, about forty-five degrees, overcast, and very humid.

64. Joey met with Euel, who showed him where the pipe that needed repair was located. Joey got to work and replaced the leaky flange along with the bolts that secured the elbow.

65. The repair as completed at about 7:45am.

66. Once complete, Euel advised his supervisor, Andrews, that he was going to turn the steam back on. Euel, Joey, and Andrews began to walk towards the stairs the utility room. Andrews was stopped by another employee and asked to unlock the breakroom. While Andrews assisted the employee, Joey and Euel proceeded downstairs.

67. Euel and Joey opened the steel door to the utility room. It swung in and to the left, in the direction of the valves that controlled the steam coming in from the main line. To access the valves, they closed the door and Euel prepared to open the valves.

68. In the time the system in Building 22 had been shut off, the pipes cooled and three-quarters of a gallon of condensate collected in the drip leg of the system in the utility room.

69. The condensate was not properly drained. Indeed, the design of the system made it impossible to drain this condensate that had collected in the bottom of the sealed drip leg.

70. Euel began to open the valves to introduce live steam to Building 22. He opened the first valve only a small amount when the hot steam hit the cool pipes and the collected condensate. The result was a catastrophic water hammer.

71. The force of the water hammer was so significant that it ruptured the system and broke the threaded steel flange at the bottom of the drip leg free.

72. The flange, which weighs fifty pounds, fell to the concrete floor and steam pressurized to 110 pounds per square inch at a temperature of 344 degrees Fahrenheit flooded into the room from the newly open six-inch pipe.

73. The sudden change in pressure forced the steel door shut to whatever extent it was not already closed.  The flood of steam created several thousand pounds of pressure on the steel door.  It would have required heavy machinery to open the door with pressure at those levels.

74. Joey and Euel were trapped in the utility room.

75. Joey and Euel were slowly consumed by the superheated steam.  They tried to escape but it was impossible to force the door open.

76. They lay arm in arm, unable to escape, knowing they would not survive, as the steam consumed their lives over the course of several minutes.

77. The two men died, together, in the utility room of Building 22.

78. Andrews, and at least one other employee, attempted to render aid but could not move the superheated steel door, or even touch it without being burned.  It would ultimately take several hours for the pressure to dissipate and conditions to make entry into the utility room safe.

79. When first responders were able to gain entry, they found the two men deceased near the door they had been unable to open.

**Count One: Wrongful Death**

80. The allegations in paragraph 1-79 are incorporated herein by reference as if fully restated.

81. This claim is brought pursuant to Conn. Gen. Stat. § 52-555.

82. The Veterans Health Administration has a duty to maintain a safe premises. It has a duty to ensure the safety of its employees and guests, including contractors and to maintain policies, procedures, and practices that provide an environment safe from unnecessary risks and hazards.

83. Joey's death was the result of the negligent conduct of the Veterans Health Administration and its employees that breached the duty to care owed to Joey. Its negligent conduct includes, but is not limited to, their:

   a. Failure to maintain the steam distribution system in Building 22

   b. Failure to train employees on safe use of the steam distribution system in Building 22

   c. Failure to supervise employees to ensure the safe use steam distribution system in Building 22

   d. Negligent hiring and retention of supervisory employees with no steam experience

   e. Failure to train supervisors to recognize and abate risks associated with live steam

   f. Failure to maintain policies and procedures for handling and control of live steam

   g. Failure to train employees regarding use of the steam distribution system in Building 22 following the installation of new valves despite being cited by OHSA for failing to do exactly that in 2015

   h. Failure to maintain policies dictating the use of valves in steam distribution system in Building 22

   i. Failure to heed employees' warnings regarding the malfunctioning steam distribution system in Building 22

   j. Failure to regularly inspect the steam distribution system in Building 22

   k. Failure to inspect the main branch steam line that feeds Building 22 despite a prior OSHA citation for failing to do exactly that

l. Failure to observe and respond to clear warning signs that the steam distribution system in Building 22 was malfunctioning

m. Failure to maintain a lock out/tag out log

n. Failure to maintain a lock out/tag out policy

o. Negligent design of the utility room in that it had an in-swinging door that made it impossible to escape

p. Failure to design and maintain the steam distribution system in Building 22 in such a way that ensured the evacuation of condensate

q. Failure to advise the boiler plant operator of intent to recharge the steam distribution system in Building 22 on or about November 13, 2020

r. Failure to consult with the boiler plant operator when scheduling the repair work for November 13, 2020

s. Failure to implement site specific procedures to ensure safe conditions for the repair on November 13, 2020

t. Failure to properly shut down the steam distribution system in Building 22 such that condensate was properly drained and/or pumped back to the boiler

u. Allowing substantial condensate to collect in a sealed drip leg

v. Failure to delay the repair work in Building 22 until a full boiler shut down made it safe to proceed

w. Failure to ensure condensate was cleared from the steam distribution system in Building 22 prior to introducing live steam

x. Failure to advise Mulvaney Mechanical, Inc. of prevailing lock out/tag out policies and procedures

  y. Failure to ensure all lockout tags were affixed prior to work beginning on November 13, 2020

  z. Failure to follow proper protocols and safety standards for recharging the steam distribution system in Building 22

84. The Veterans Health Administration knew or should have known about the above failures and could and should have taken appropriate steps to remedy and correct them prior to November 13, 2020.

85. As a result of the aforesaid negligence, Joey perished in the utility room of Building 22 on November 13, 2020.

86. Prior to his death he experienced unthinkable conscious pain and suffering.

87. His death was caused entirely by the negligence of the Veterans Health Administration, Department of Veterans Affairs, and its employees and agents.

**Count Two: Loss of Consortium**

88. Paragraphs 1-87 of Count One are incorporated herein by reference as if fully set forth herein.

89. Christina Weaver was married to Joey on February 15, 2020.

90. They were still newlyweds on November 13, 2020.  Christina was pregnant with their first child.

91. Their child, J.O., was born in 2021.

92. The death of her husband has devastated Christina.  They had just begun their married lives and looked ahead to decades together.

93. As a consequence of her husband's death, Christina has been deprived of Joey's companionship, society, affection, emotional and moral support, sexual relations, financial support, and other matters of value arising from their marriage.

94. She has been denied the joy of raising her son along with her husband.

95. Christina has suffered severe emotional distress and loss of consortium due to the negligence of the Veterans Health Administration and Department of Veterans Affairs that caused the death of her husband, Joseph J. O'Donnell.

WHEREFORE, the Plaintiffs claim:

1. Compensatory Damages;
2. Interest;
3. Costs;
4. Such other and further relief as this Court may deem fair and equitable.

THE PLAINTIFFS,

By: */s/ Andrew J. Buzzi, Jr.*
Andrew J. Buzzi, Jr. (CT05778)
The Law Office of Andrew J. Buzzi, Jr., LLC
69 North Street
Danbury, Connecticut 06810
Tel: (203)791-9176
pleadings@ajblaw.com

By: */s/ Christopher Parkin*
Christopher Parkin (CT28074)
Law Office of Chris Parkin, LLC
69 North Street
Danbury, CT
Tel: (203) 290-1807
chris@parkinlegal.com